# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| M & J COMMUNICATIONS, INC., on behalf of itself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| AAA COOPER TRANSPORTATION; ARKANSAS BEST CORPORATION; ABF FREIGHT SYSTEMS, INC.; AVERITT EXPRESS, INC.; CONWAY INC., CON-WAY FREIGHT, INC.; ESTES, EXPRESS LINES, INC.; FEDEX CORPORATION; FEDEX FREIGHT CORPORATION; FEDEX NATIONAL LTL, INC.; JEVIC TRANSPORTATION, INC.; OLD DOMINION FREIGHT LINE, INC.; OVERNITE CORPORTATION; ROADWAY EXPRESS, INC.; R+L CARRIERS, INC.; SAIA, INC.; SAIA MOTOR FREIGHT LINE, LLC; SOUTHEASTERN FREIGHT LINES, INC.; SUN CAPITAL PARTNERS IV, LLC; UNITED PARCEL SERVICE, INC; WATKINS MOTOR LINES; YELLOW TRANSPORTATION, INC.; YRC REGIONAL TRANSPORTATION, INC.; and YRC WORLDWIDE, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **Civil Action No. _____** **CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** **INJUNCTIVE RELIEF SOUGHT** |
| Defendants. | ) ) |

Plaintiff, M & J Communications, Inc., on behalf of itself and all others similarly situated, through undersigned counsel, hereby brings this action seeking treble damages, other monetary relief and equitable relief for Defendants' violations of the federal antitrust laws. Plaintiff's allegations as to itself and its actions, as set forth in para. 8, are based upon personal knowledge. All other allegations are based on information and belief pursuant to the investigation of counsel.

1279305.1

## NATURE OF ACTION

1.      This lawsuit is brought as a class action on behalf of all persons or entities, from at least early as June 15, 2003 to the present, who purchased LTL freight transportation services directly from Defendants.

2.      As alleged more fully below, during the Class Period, and possibly earlier, Defendants conspired to fix, raise, stabilize and/or maintain the price levels for LTL freight transportation services, specifically fuel surcharges and line-haul rates.

3.      Defendants agreed to implement identical fuel surcharges and apply and compute them in an identical manner as a percentage of the line haul or base rates.  In addition to conspiring to implement and charge fuel surcharges Defendants also agreed to fix, raise, stabilize and/or maintain the line haul or base rates for freight transportation services.

4.      As a direct and proximate result of Defendants' unlawful contract, combination or conspiracy, Plaintiff and members of the Class have been and continue to be denied the benefits of free and unrestrained competition in the market for LTL freight transportation services and have been forced to pay artificially high rates for LTL freight transportation services, including but not limited to surcharges for fuel and line-haul rates, causing them to sustain injury to their business or property.

## JURISDICTION AND VENUE

5.      This action arises under Section 1 of the Sherman Act and Section 4 of the Clayton Act.

6.      Jurisdiction of this Court is founded on Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and on 28 U.S.C. §§ 1331, 1337.

1279305.1

7.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391(b) and (c), in that more than one Defendant resides in the judicial district, is licensed to do business, and/or is doing business in this judicial district.  The interstate trade and commerce described herein has been carried out, in part, within this district.

## PARTIES

8.     Plaintiff M & J Communications, Inc. is a Florida corporation doing business in Broward County Florida.  During the Class Period, M & J Communications purchased LTL freight transportation services directly from one or more of the Defendants and was assessed and paid fuel surcharges.

9.     Defendant YRC Worldwide, Inc. ("YRC") (formally named Yellow Corporation, Yellow Freight System, Inc., of Delaware and Yellow Roadway Corporation) is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211-1213.  The YRC group of companies is the largest LTL freight transportation services provider in the United States and one of the largest in the world.  YRC operates in the LTL market through its wholly-owned operating subsidiaries Yellow Transportation, Inc., Roadway Express, Inc. and YRC Regional Transportation Inc.  During the Class Period, YRC directly and/or through its affiliates sold LTL fright transportation services throughout the United States.  According to SJ Consulting Group, Inc., experts in the transportation and logistics industries, the YRC conglomerate of companies had annual revenues from its LTL businesses in excess of $8.4 billion in 2006.

10.     Defendant Yellow Transportation, Inc. is an Indiana corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211 and additional offices located at 1 N. Capital Avenue and 36 S. Pennsylvania Street, Suite 70, Indianapolis, Indiana

46204.  Yellow Transportation is a wholly-owned subsidiary of Defendant YRC Worldwide, Inc. During the Class Period, Yellow Transportation directly sold LTL freight transportation services throughout the United States.  In 2006, Yellow Transportation had annual revenues from its LTL business of over $3 billion.

11.     Defendant Roadway Express, Inc. is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211.  Roadway Express is a wholly-owned subsidiary of Defendant YRC.  During the Class Period, Roadway Express directly sold LTL freight transportation services throughout the United States.  In 2006, Roadway Express had annual revenues from its LTL business of over $3 billion.

12.     Defendant YRC Regional Transportation, Inc. is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211.  YRC Regional Transportation is a wholly-owned subsidiary of Defendant YRC.  During the Class Period, YRC Regional Transportation, commonly known as the "YRC Regionals," directly sold LTL freight transportation services throughout the United States.  This YRC group had revenues in 2006 in excess of $2 billion.

13.     Defendant FedEx Corporation ("FedEx") is a Delaware corporation with its headquarters located at 942 South Shady Side Grove Road, Memphis, Tennessee 38120.  FedEx is an internationally recognized company providing transportation, packaging, shipping, LTL freight transportation services, e-commerce and business solutions.  The FedEx group of companies is believed to be the second largest provider of LTL services with annual revenues of $4.5 billion in fiscal year 2007.  In September 2006, FedEx purchased the LTL operations of Defendant Watkins Motor Lines, bringing its total annual LTL revenue to over $5.4 billion. During the Class Period, FedEx directly and/or through its control of its affiliates, including

- 4 -

without limitation to its wholly-owned subsidiary FedEx Freight Corporation, FedEx National LTL and Watkins Motor Lines, sold LTL freight transportation services throughout the United States.

14.     Defendant FedEx Freight Corporation is a Delaware corporation with its headquarters located at 942 South Shady Grove Road, Memphis, Tennessee 38120.   FedEx Freight Corporation is a wholly-owned subsidiary of Defendant FedEx and provides (as alleged in the preceding paragraph) LTL freight transportation services throughout the United States. During the Class Period, FedEx Freight Corporation directly and/or through or under the control of its affiliates sold LTL freight transportation services throughout the United States.

15.     Defendant FedEx National LTL, Inc. is a Delaware corporation with its headquarters located at 1715 Aaron Brenner Drive, Suite 600, Memphis, Tennessee 38120. FedEx National LTL is a wholly-owned subsidiary of Defendant FedEx and known as its LTL division.   Defendant Watkins Motor Lines was "rebranded" as FedEx National LTL after its purchase by FedEx in September 2006.   During the Class Period, FedEx National LTL directly sold LTL freight transportation services throughout the United States.

16.     Defendant Watkins Motor Lines is a Florida corporation and was, during a significant portion of the Class Period, a private trucking company with its headquarters located in Lakeland, Florida.   Watkins Motor Lines was purchased by FedEx in September 2006 for $780 million and is now a wholly-owned subsidiary of Defendant FedEx.   In 2006, Watkins Motor Lines revenues from its LTL business were in excess of $1 billion.   After September 2006, Watkins Motor Lines was "rebranded" as Defendant FedEx National LTL.

17.     Defendant Con-Way Inc. ("Con-Way") (formerly known as CNF, Inc.) is a publicly-traded company providing LTL through its wholly-owned subsidiary Con-Way Freight

throughout the United States.  Con-Way's headquarters are at 2855 Campus Drive, Suite 300, San Mateo, California 94403.  During the Class Period, Con-Way directly and/or though its control of its affiliates, including without limitation Defendant Con-Way Freight, Inc., provided LTL freight transportation services throughout the United States.

18.     Defendant Con-Way Freight, Inc. is a Delaware corporation with its headquarters located at 10 Parkland Plaza, Ann Arbor, Michigan 48103.  Con-Way Freight is a wholly-owned subsidiary of Defendant Con-Way and provides LTL freight transportation services in the United States with annual revenues just under $3 billion.   During the Class Period, Con-Way Freight Inc. directly and/or through or under the control of its affiliates sold LTL freight transportation services throughout the United States.

19.     Defendant United Parcel Service, Inc. ("UPS") is a Delaware corporation with its headquarters located at 55 Glenlake Parkway, NE, Atlanta, Georgia 30328.   UPS is an internationally recognized freight, package delivery and supply chain management company.  In August 2005, UPS acquired Overnite Corporation for $1.25 billion and entered the LTL market. UPS is now believed to be the fourth largest LTL freight transportation service provider in the United States.  In 2006, UPS "rebranded" Overnite Corporation as UPS Freight.  UPS Freight's annual revenues for 2006 were in excess of $1.8 billion and according to the American Trucking Association, it is now the fourth largest LTL provider.  During the Class Period, UPS directly and/or through its control of its affiliates, including without limitation its UPS Freight business, sold LTL freight transportation services throughout the United States.

20.     Overnite Corporation is a Virginia corporation with its headquarters located at 1000 Semmes Avenue, Richmond, Virginia 23224.  For a significant portion of the Class Period, Overnite was independently operated.  Overnite was the fourth largest LTL provider in 2005

- 6 -

with revenues in excess of $1.8 billion.   As described above, Overnite is now owned by Defendant UPS and has been "rebranded" as UPS freight.  During the Class Period, Overnite sold LTL freight transportation services throughout the United States

21.   Defendant Arkansas Best Corporation is a publicly-traded Delaware corporation with its headquarters located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903. Arkansas Best is a trucking conglomerate offering LTL freight transportation services under a variety of business names and wholly-owned alter-ego subsidiaries, including without limitation, ABF Freight System, ABF Freight System Canada, ABF Cartage, Land-Marine Cargo and FreightValue, Inc.  The Arkansas Best group of companies is believed to be the fifth largest provided of LTL freight transportation services in the United States.  During the Class Period, Arkansas Best Corporation directly and/or through its control of its affiliates, including without limitation its wholly-owned subsidiary Defendant ABF Freight Systems, Inc., sold LTL freight transportation services throughout the United States.

22.   Defendant ABF Freight Systems, Inc. is a Delaware corporation with its headquarters also located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.  ABF Freight Systems is a wholly-owned subsidiary of Defendant Arkansas Best Corporation.  ABF Freight Systems services all 50 states and in 2006, its revenues exceeded $1.8 billion.  During the Class Period, ABF Freight Systems sold LTL freight transportation services throughout the United States.

23.   Defendant Estes Express Lines, Inc., is a privately held Virginia corporation with its headquarters located at 3901 West Broad Street, Richmond Virginia 23230.  Estes Express Lines appears to be the sixth largest LTL freight transportation service provider in the United States with revenues in 2006 exceeding $1.4 billion.  Estes Express Lines operates 185 terminals

and a fleet of over 29,000 tractors and trailers.  During the Class Period, Estes Express Lines sold LTL freight transportation services throughout the United States.

24.     Defendant Old Dominion Freight Line, Inc. ("Old Dominion") is a publicly-traded Virginia corporation with its headquarters located at 500 Old Dominion Way, Thomasville, North Carolina 27360.  Old Dominion is believed to be the seventh largest LTL freight transportation service provider in the United States with revenues in 2006 exceeding $1.1 billion. Old Dominion operates over 4,600 tractors, 13,000 trailers and 188 service centers throughout the United States.

25.     Defendant Saia, Inc. ("Saia") (formerly known as SCS Transportation, Inc.) is a publicly-traded Delaware corporation with its headquarters located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097.  Saia provides LTL freight transportation services to about 34 states and operating 148 terminals through its wholly-owned operating subsidiary Saia Motor Freight Line, LLC.  The Saia group of companies is believed to be the eight largest LTL freight transportation service provider in the United States.  Previously, Saia had been a wholly-owned subsidiary of Yellow Corporation (now know as Defendant YRC Worldwide) and became and independent public company on September 30, 2002.  On or about June 30, 2006, Saia completed the sale of Defendant Jevic Transportation, Inc., to a private investment firm, Defendant Sun capital Partners IV, LLC.  During the Class Period, Saia directly and/or through its control of its affiliates, including without limitation its wholly-owned subsidiary Saia Motor Freight Line, LLC, sold LTL freight transportation services throughout about 30 states of the United States in the West, Midwest, Southeast and Southwest regions of the United States.

26.     Defendant Saia Motor Freight Line, LLC is a wholly-owned subsidiary of Defendant Saia, with its headquarters located at 11465 Johns Creek Parkway, Suite 400, Duluth,

Georgia 30097.   In 2006, Defendant Saia Motor Freight, LLC reported annual revenues of $874.7 million.  During the Class Period, Defendant Saia Motor Freight line, LLC directly and/or under the control of its affiliates, including without limitation Defendant Saia, sold LTL freight transportation services throughout a majority of the United States.

27.     Defendant Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation with its headquarters located at 600-700 Creed Road, Delanco, New Jersey 08075.  Jevic is a major regional LTL carrier operating in the Northeastern United Sates.  Jevic's fleet consists of about 1,400 tractors and 2,400 trailers.  Their 2005 revenues were about $350 million.  Prior to June 2006, Jevic was owned by Defendant Saia, Inc.  At that time Jevic was sold by Saia to a private investment firm, Defendant Sun Capital Partners IV, LLC.  During the Class Period, Jevic directly and/or through its control of its affiliates sold LTL freight transportation services in the Northeastern United States.

28.     Sun Capital Partners IV, LLC is a private equity fund and Delaware limited liability company, with its headquarters located at 5200 Town Center Circle, Suite 470, Boca Raton, Florida 33486.  Sun Capital Partners purchased Defendant Jevic in or about June of 2006.  During the Class Period, Sun Capital Partners directly and/or through its control of its affiliate Jevic sold LTL freight transportation services in the Northeastern United States.

29.     Defendant Averitt Express ("Averitt") is a privately held Tennessee corporation with its headquarters located at Perimeter Place One, 1415 Neal Street, Cookeville, Tennessee 38502.  Averitt provides LTL freight transportation services in about 18 states in the Southeast, parts of the Southwest, Midwest regions of the United States and through partnerships elsewhere in North America.  Averitt operates a fleet of approximately 4,000 tractors and 11,250 trailers from a network of about 80 terminals.  Averitt's 2006 and 2007 revenues are estimated to be

over $800 million.  During the Class Period, Averitt directly sold LTL freight transportation services throughout the United States.

30.     Defendant R+L Carriers, Inc. ("R+L"), a privately held Ohio corporation, is headquartered at 600 Gilliam Road, Wilmington, Ohio 45177.  R+L is an LTL company, servicing 43 states, operating a fleet of more than 13,000 tractors and trailers, with annual revenues in 2005 and 2006 of almost $800 million.  R+L operates under its own name and under the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount Transportation.  During the Class Period, R+L directly and/or through its control of its affiliates sold LTL freight transportation services in 43 states throughout the United States.

31.     Southeastern Freight Lines, Inc. is a South Carolina corporation with its headquarters located at 420 Davega Road, Lexington, South Carolina 29073.  Southeastern Freight Lines is a major regional LTL freight transportation service provider operating in 12 states in the Southeast and parts of the Southwest, with revenues in 2006 exceeding $700 million.   During the Class Period, Southeastern Freight Lines directly sold LTL freight transportation services in the Southeastern and Southwestern regions of the United States.

32.     AAA Cooper Transportation, Inc. is an Alabama corporation with its headquarters located at 1751 Kinsey Road, Dothan, Alabama.  AAA Cooper Transportation is a major regional LTL freight transportation service provider operating in 15 states in the Southeast and parts of the Southwest, with revenues in 2005 and 2006 in excess of $500 million.  During the Class Period, AAA Cooper Transportation directly sold LTL freight transportation services in the Southeastern and Southwestern regions of the United States.

33.     Southern Motor Carriers Rate Conference, Inc. does business under the following name:  SMC[3].  SMC[3] holds itself out as an industry association and also functions as a motor

carrier rate bureau.  SMC³ is incorporated under the laws of the State of Georgia with offices in Peachtree City, Georgia and Louisville, Kentucky.  SMC³ facilitates the pricing activities for LTL carriers operating in the U.S, which includes providing data and pricing information to the LTL industry.

## CO-CONSPIRATORS AND AGENTS

34.     Other natural persons, corporations, and entities not named as Defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

35.     Whenever in this Complaint reference is made to a statement, or transaction of any corporation or entity, the allegation  means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

## FACTUAL ALLEGATIONS

### THE LTL INDUSTRY

36.     LTL stands for "less-than-truckload" and describes shipments by trucks that are less than a trailer load in size.  LTL carriers are the trucking companies that handle shipments of less than a trailer load in size.  LTL carriers consolidate numerous shipments generally ranging from 100 to 10,000 pounds.  In local areas, LTL carriers collect various shipments from several customers and deliver them directly to local destinations, or may operate a terminal where all shipments are received then transferred to delivery trucks.  Regional and national delivery LTL carriers operate networks of terminals that receive and distribute locally, connected by long distance routes.

1279305.1

37.    In 2006 the LTL industry was a $33.6 billion market made up several large companies that include YRC Worldwide, UPS, FedEx and Con-way Freight.  To enter the LTL market requires significant capital outlay, a large well trained and skilled work force, and the ability to control the significant costs in the LTL industry.  As one executive of a large LTL carrier had stated "significant barriers to entry [in the LTL industry]" make it difficult "if not impossible" for new competitors to enter this market.

38.    LTL freight transportation services are for the most part a commodity.  LTL carriers' services are readily substitutable with price being the most important distinguishing characteristic.

39.    Profitability in the LTL industry is sensitive to increases in price for diesel fuel. Up until the time of the conspiracy there was a correlation between failures of LTL carriers and the rise in the price for diesel fuel: The higher the price of diesel fuel went, the more LTL carriers filed bankruptcy.  This time proven correlation was broken as a result of the LTL carriers' conspiracy to raise line haul or base rates and fuel surcharges.

40.    The cost to a class member for using LTL freight transportation services is usually billed using two different components.  One component is the line haul rate or base rate. This rate is what the LTL carrier charges for transporting freight from one point to the other. The line haul rate is based on several factors which include weight, mileage, origin of the shipment and destination. The line haul or base rates are published by the LTL carriers and are made available to their customers.  This allows customers to know what the line haul or base rates are for shipping freight via LTL from one zip code to another.

41.    The second component of a bill for LTL freight services is the fuel surcharge. The fuel surcharge is billed using a sliding rate.  The rate is determined as a function of the US

Department of Energy's US National Average Diesel Fuel Index which is published each Monday.   In general, the fuel surcharge rises by 0.5 percent for every five cent increase in U.S. National Diesel Fuel Index.

42.   Fuel surcharges first became a part of the transportation industry in the early 1970s in response to the Arab oil embargo.  The surcharges disappeared for several years and then reappeared in mid 1990s.  However, when they initially reappeared, the fuel surcharges were not imposed by LTL carriers at uniform levels, and consequently purchasers of LTL freight transport services could avoid fuel surcharges by routing around LTL carriers who were implementing fuel surcharges.  This ultimately led LTL carriers to suspend their use.

43.   As the LTL industry became deregulated very large shippers began to demand uniformity from LTL carriers.   These large shippers did not want the logistical costs and inefficiencies of having to interact with hundreds of LTL carriers.   Large shippers began demanding that just a few LTL carriers meet a significant portion of their shipping needs.  To meet this demand the LTL carriers began to consolidate causing small regional LTL carriers to be absorbed by larger LTL carriers.

44.   In 2003 Yellow, at that time the largest LTL carrier, merged with Roadway, which at that time was the second largest LTL carrier, to become YRC Worldwide.   YRC purchased USF, another large LTL carrier in 2005.  FedEx expanded ITS role in the LTL market in 2001 when they acquired American Freightways and combined this entity with Viking Freight, a unit it had purchased previously.   FedEx later purchased Watkins to increase its presence in the LTL market.   UPS also became part the consolidation when it purchased large, national LTL carrier, Overnite Express.

45.     The LTL market was further consolidated by Consolidated Freightways' departure from the LTL industry in the last half of 2002.   The failure of Consolidated Freightways removed as much fifteen percent of the capacity in the LTL industry.   The consolidation in this industry has caused the market share for LTL freight transportation services to be held in the hands of just a few LTL carriers.   The combined market shares of the Defendants exceeds 75%.   Of the sixty major LTL carriers that were in existence in 1983 only six remain in existence today.

## THE LTL CONSPIRACY ON LINE HAUL RATES AND FUEL SURCHARGES

46.     With capacity in the LTL market at new lows and the consolidation of the LTL industry, in or around 2003 the fuel surcharge conspiracy became effective.   In previous years LTL carriers were unsuccessful in ensuring that fuel surcharges were being implemented.   Many shippers refused to pay fuel surcharges and many LTL carriers were unsuccessful in imposing them.   However, starting in or around 2003 LTL carriers became united in their efforts and conspired to impose fuel surcharges and raise line haul rates.

47.     The LTL carriers' efforts in this regard were facilitated by their affiliation and participation with SMC[3].   SMC[3] holds itself out as an industry leader in providing information and data to the LTL industry.   SMC[3] also acts as a rate setting bureau for the LTL industry and annually issues an SMC[3] tariff for the LTL industry.   The SMC[3] tariffs are base rates or line haul rates that are set by SMC[3] for LTL transportation services pursuant to 49 U.S.C. § 13703.   These rates are approved by the Surface Transportation Board ("STB") and can be adopted by LTL carriers as their line haul rates.   An LTL carrier is free to become a member of the SMC[3].   The SMC[3] counts as its members the following Defendants: AAA Cooper Transportation, Averitt Express, Inc., Estes Express Lines, Inc., Old Dominion Freight Line, Inc., R+L Carriers, Inc.,

Saia Motor Freight Line, LLC, Southeastern Freight Lines, Inc., UPS Freight,  and YRC Logistics (a wholly owned subsidiary of Defendant YRC worldwide)

48.   The SMC$^3$ tariff is the responsibility of the SMC$^3$'s General Rate Committee. Each member of SMC$^3$ who is an LTL carrier has a representative on the General Rate Committee.   Each year, using information collected from its members, the LTL industry and other data sources, the General Rate Committee meets to adopt a new SMC$^3$ tariff which usually calls for increased base or line haul rates.

49.   Along with its duties as a rate bureau for the LTL industry, SMC$^3$ specializes in the collection and dissemination of data and information related to the LTL industry.  SMC$^3$ not only provides LTL carriers with the SMC$^3$ tariff, it also provides LTL carriers with information and data related to fuel surcharges and line haul rates for most if not all of the LTL carriers, including the Defendants.  Thus, through their affiliation with SMC$^3$ LTL carriers are provided with the fuel surcharges and line haul rates for almost all of the LTL carriers.

50.   The SMC$^3$ not only provides the data and information necessary for the LTL carriers to conspire, it also provide the opportunity for LTL carriers to meet and discuss fuel surcharges and base or line haul rate pricing.  By participating in the SMC$^3$ rate setting process Defendants gain knowledge not only of  what SMC$^3$ tariffs will be but what the industry as a whole will be charging  for line haul or base rates and fuel surcharges in the coming year. Through the Defendants' participation in this process a forum has developed where Defendants can conspire to raise fix and maintain line haul or base rates.

51.   This led to an industry practice where SMC$^3$ held meetings with LTL carriers as part of the SMC$^3$'s General Rate Setting Committee.  From these meetings SMC$^3$ announced a general rate increase for line haul rates.  At or around the conclusion of these meetings LTL

- 15 -

carriers would announce their own line haul rates which were within tenths of percentages of each other.  For example, in the first quarter of 2005 $SMC^3$'s General Rate Setting committee had several meetings and discussions concerning tariffs and information related to the LTL market.  These meetings culminated in the adoption and announcement by $SMC^3$ of a general rate increase.  Sometime after these meetings LTL carriers announced almost identical general rate increases for their line haul or base rates which varied by tenths of a percent.  The following chart contains the general rate increases in 2005 for various LTL carriers:

| Carrier | % Increase | Effective Date |
|---|---|---|
| AAA Cooper | 5.5% | May 2 |
| A. Duie Pyle | 5.5% | March 7 |
| Con-Way Transportation | 5.5% | May 2 |
| FedEx Freight | 5.6% | May 16 |
| Old Dominion Freight Line | 5.9% | May 16 |
| Overnite Transportation | 5.6% | May 2 |
| Roadway Express | 5.8% | April 25 |
| Saia Motor Freight | 5.9% | May 2 |

52.     Through the process of setting the $SMC^3$ tariffs LTL carriers shared pricing information with each other and confirmed the rate setting intentions of other LTL carriers.  This has allowed the LTL carriers to increase their line haul or base rates without fear of losing market share.  The LTL carrier Defendants through their participation in the $SMC^3$ rate setting process are conspiring to maintain, stabilize and raise the prices for line haul rates.

53.     The foregoing activities of these Defendants and $SMC^3$ are not immune from antitrust liability under 49 U.S.C. § 13703 since they did not adopt the $SMC^3$ tariff or other rate bureau rates nor do they file the agreed-to line haul or base rates with the STB.

54.     Along with conspiring to raise and maintain the prices for line haul rates through the $SMC^3$ rate setting process, LTL carriers also used rate setting meetings to discuss and gauge

the intentions of the LTL market with regard to implementing and enforcing fuel surcharges. This anti-competitive conspiracy was further augmented by SMC[3]'s collection and dissemination of pricing information for the LTL industry.  The information collected and disseminated by SMC[3] included information on the implementation of fuel surcharges by most if not all of the LTL carriers in the industry.

55.     Through Defendants' participation in SMC[3] and the rate setting process during the Class Period the LTL carriers conspired and agreed to implement virtually identical fuel surcharges. The fuel surcharges were implemented using virtually identical formulas and methodologies.  LTL carriers did not invest time and resources to develop their own fuel surcharge policies; instead they conspired to adopt the same fuel surcharges and the method for determining the surcharges.

56.     The fact that LTL carriers did not establish their own pricing policies but instead conspired to use the same fuel surcharges is illustrated by the following chart.  The chart shows that fuel surcharges were assessed in virtually the same manner by the LTL carriers as the price of fuel rose during the Class Period.

| Diesel Fuel $/gal. | Arkan Best | Averitt | Con-way | FedEx Freight | Jevic | Old Domin. | R+L | Saia | UPS | YRC |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.80 | 8.9% | 8.9% | 9.0% | 8.9% | 8.9% | 8.5% | 8.9% | 8.9% | 8.9% | 8.9% |
| 2.00 | 10.9% | 10.8% | 10.9% | 10.9% | 10.9% | 10.5% | 10.9% | 10.9% | 10.9% | 10.9% |
| 2.20 | 12.9% | 12.9% | 12.9% | 12.9% | 13.0% | 12.5% | 12.9% | 12.9% | 12.9% | 12.9% |
| 2.40 | 14.9% | 14.9% | 14.9% | 14.9% | 15.0% | 14.5% | 14.9% | 14.9% | 14.9% | 14.9% |
| 2.60 | 16.9% | 16.9% | 16.9% | 16.9% | 17.0% | 16.5% | 16.9% | 16.9% | 16.9% | 16.9% |
| 2.80 | 18.9% | 18.9% | 18.9% | 18.9% | 19.0% | 18.5% | 18.9% | 18.9% | 18.9% | 18.9% |
| 3.00 | 20.9% | 20.9% | 20.9% | 20.9% | 21.0% | 20.5% | 20.9% | 20.9% | 20.9% | 20.9% |
| 3.20 | 22.9% | 22.9% | 22.9% | 21.9% | 23.0% | 22.5% | 21.9% | 22.9% | 22.9% | 22.9% |
| 3.40 | 24.9% | 24.9% | 24.9% | 22.9% | 25.0% | 24.5% | 22.9% | 24.9% | 24.9% | 24.9% |
| 3.60 | 26.9% | 26.9% | 26.9% | 23.9% | 27.0% | 26.5% | 23.9% | 26.9% | 26.9% | 26.9% |

1279305.1

57.     The fuel surcharges for LTL carriers use almost identical trigger points and are tied to an index of diesel fuel prices published by the United States Department of Energy.  The LTL carriers also assess fuel surcharges as a percentage of their base or line haul rate.  During the Class Period this method for assessing fuel surcharges was implemented across LTL carriers despite their very different cost and operational structures.  By adopting the same procedures for assessing fuel surcharges LTL carriers prevented shippers from being able to avoid fuel surcharges by switching carriers.

58.     The SMC[3] tariff that is approved by the STB does not include fuel surcharges.  Accordingly, there is no immunity with regard to the agreement between LTL carriers to charge and implement almost identical fuel surcharges alleged in this Complaint.   Further, the agreement among the Defendant LTL carriers to charge and implement almost identical fuel surcharges has never been submitted for approval to the STB, and, therefore, they are not entitled to any immunity related to their conspiratorial actions.

## LTL FUEL SURCHARGES ARE A PROFIT CENTER

59.      Although LTL carriers represented to their customers that they implemented the fuel surcharges to cover the costs of rising diesel fuel, the fuel surcharges were in fact revenue generators that more than reimbursed carriers for their fuel costs.

60.     Both the Defendants and analysts have acknowledged that the revenues of LTL carriers' increase significantly as diesel fuel prices rise.

61.     At least one industry analyst has noted that "generally the LTL carriers make money on fuel surcharges, and that earnings for LTL providers would be hurt by sustained lower fuel costs.  Another industry analyst stated that fuel surcharges are "additional revenues that contribute substantially to operating profits after fuel expense."

- 18 -

62.     Defendant Old Dominion frankly admitted in its 2006 annual report that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability:

> A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revised our pricing strategy to reflect these changes.

63.     Defendant YRC made this admission:

> In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term.

64.     The Arkansas Best Defendants made this admission:

> As diesel fuel prices decline, the fuel surcharges and associated direct diesel fuel costs also decline by different degrees.  Depending upon the rates of these declines and the impact on costs in other fuel and energy-related areas, operating margins could be negatively impacted.

65.     The SAIA Defendants also made this admission:

> While fuel costs increased during 2006, higher fuel surcharges have more than offset higher diesel costs.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action both on behalf of itself, and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following class (the "Class"):

> All persons or entities which purchased LTL freight transportation services directly from defendants or their unnamed co-conspirators from June 15, 2003 to the present. Excluded from the Class are Federal entities, defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

67.     Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants.  Plaintiff believes that, due to the nature of

trade and commerce involved, there are likely thousands of Class members in the United States such that joinder of all Class members is impracticable.

68.    Plaintiff's claims are typical of the claims of the Class in that the Plaintiff purchased LTL freight transportation services from Defendants, all Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

69.    Several questions of law or fact arise from Defendants' anti-competitive conduct that are common to the Class, they include:

a.    whether Defendants engaged in a contract, combination, or conspiracy among themselves to fix, maintain or stabilize the prices of, or allocate the market for, LTL freight transportation services sold in the United States;

b.    whether Defendants engaged in a contract, combination, or conspiracy among themselves to fix, maintain or stabilize, or allocate the market for, the line haul or base rates for LTL freight transportation services sold in the United States;

c.    Whether Defendants engaged in a contract, combination, or conspiracy among themselves to fix, maintain or stabilize the prices of, or allocate the market for fuel surcharges for LTL freight transportation services sold in the United States;

d.    Whether the conduct of the Defendants caused prices for LTL freight transportation services sold in the United States, to be artificially inflated or maintained at non-competitive levels;

e.    Whether the conduct of the Defendants caused the line haul or base rates for LTL freight transportation services sold in the United States, to be artificially inflated or maintained at non-competitive levels;

- 20 -

f.     Whether the conduct of the Defendants caused the fuel surcharges for LTL freight transportation services sold in the United States, to be artificially inflated or maintained at non-competitive levels;

g.     Whether Plaintiff and other members of the Class were injured by the conduct of the Defendants and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief;

70.    The aforementioned questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

71.     Plaintiff's claims are typical of the claims of each of the members of the Class in that Plaintiff is a typical purchaser of LTL freight transportation services from Defendants in that Plaintiff's claims arise from the same course of conduct as the other members of the class. There is no conflict of interest between Plaintiff and other members of the Class.  Plaintiff has retained and is represented by counsel experienced in class actions and antitrust law.

72.    The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, so that the certification of this case as a Class action is superior to other available methods for the fair and efficient adjudication of the controversy.

73.    Prosecution of separate actions by individual Class members would create the risk of inconsistency or varying adjudications, establishing incompatible standards of conduct for the Defendants.

74.    Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.

1279305.1

## COUNT I

### Violation of Sherman Act § 1 - 15 U.S.C. § 1

75.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

76.     Defendants and their co-conspirators have engaged in a horizontal contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1.

77.     From at least as early as June 15, 2003, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to fix, raise, maintain or stabilize the prices of LTL freight transportation services which include but are not limited to surcharges for items such as fuel in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1.

78.     The contract, combination or conspiracy has had and will continue to have the following effects:

      a.    Competition in the LTL freight transportation services market has been unlawfully restrained, suppressed or eliminated;

      b.    Plaintiff and members of the Class have been denied the benefits of free open and unrestricted competition in the LTL freight transportation services market;

      c.    The price of LTL freight transportation services, including but not limited to surcharges for fuel have been maintained or stabilized at artificially high and non-competitive levels; and

1279305.1

       d.     The price of LTL freight transportation services, including but not limited to line haul or base rates have been maintained or stabilized at artificially high and non-competitive levels.

79.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property and have paid artificially high prices for LTL freight transportation services including but not limited to surcharges for fuel.

80.     If not permanently enjoined, the unlawful contract, combination or conspiracy will continue and cause irreparable harm to Plaintiff and members of the Class who have no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class pray that the Court enter judgment in their favor as follows:

       A.     Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

       B.     Declaring that Defendants violated and are in violation of the Sherman Act § 1, state and common law alleged herein;

       C.     Awarding threefold the damages sustained by Plaintiff and members of the Class as a result of Defendants' violations;

       D.     Ordering injunctive relief preventing and restraining Defendants and all persons acting on their behalf from engaging in the unlawful acts alleged herein;

E.     Awarding Plaintiff and the Class the costs, interest, expenses, and reasonable attorneys' fees and experts' fees for bringing and prosecuting this action; and

F.     Awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

Dated:  November 15, 2007         **PRETI FLAHERTY BELIVEAU**
                                    **& PACHIOS, LLP**

                                    /s/ Gregory P. Hansel

By:     _____

                                  Gregory P. Hansel
                                  One City Center
                                  PO Box 9546
                                  Portland, ME 04112
                                  Tel:  (207) 791-3000
                                  Fax:  (207) 791-3111
                                  E-Mail:  ghansel@preti.com

                                  Manuel J. Dominguez
                                  BERMAN DeVALERIO PEASE
                                   TABACCO BURT & PUCILLO
                                  222 Lakeview Avenue, Suite 900
                                  West Palm Beach, FL 33401
                                  Tel:  (561) 835-9400
                                  Fax:  (561) 835-0322
                                  E-Mail:  mdominguez@bermanesq.com

                                  Joseph J. Tabacco
                                  Todd A. Seaver
                                  BERMAN DeVALERIO PEASE
                                   TABACCO BURT & PUCILLO
                                  425 California Street, 21st Floor
                                  San Francisco, CA 94104
                                  Tel:  (415) 433-3200
                                  Fax:  (415) 433-6382

- 24 -

E-Mail: jtabacco@bermanesq.com
tseaver@bermanesq.com

Marc J. Greenspon
MARC J. GREENSPON, ESQ.
6200 Spring Isles Blvd.
Lake Worth, FL 33463
Telephone:  (954) 817-6272
Facsimile:  (561) 439-0651
E-Mail:  mjgreenspon@yahoo.com

*Attorneys for Plaintiff and the
Proposed Class*

- 25 -